1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10               FOR THE DISTRICT OF OREGON

11  ANNETTE C. ANDERSON,            )
                                    )
12               Plaintiff,         )
                                    )     No.  CV-08-3026-HU
13       v.                         )
                                    )
14  MICHAEL J. ASTRUE,              )
    Commissioner, Social Security   )
15  Administration,                 )     OPINION & ORDER
                                    )
16               Defendant.         )
    _____)

17

18  Arthur W. Stevens III
    BLACK, CHAPMAN, WEBBER, STEVENS, PETERSEN & LUNDBLADE
    221 Stewart Avenue, Suite 209
19  Medford, Oregon 97501

20       Attorney for Plaintiff

21  Karin J. Immergut
    UNITED STATES ATTORNEY
22  District of Oregon
    Britannia I. Hobbs
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  / / /

26  / / /

27  / / /

28  / / /

1 - OPINION & ORDER

Terrye E. Shea
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Assistant Regional Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Annette Anderson brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g).

     All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).  For the reasons explained below, I affirm the Commissioner's decision.

PROCEDURAL BACKGROUND

     Plaintiff protectively filed for DIB on January 6, 2005, and for SSI on June 27, 2005, alleging an onset date of September 20, 2000.  Tr. 13, 51-54.[1]  Her applications were denied initially and on reconsideration.  Tr. 13, 22-25, 541-43.

     On July 17, 2007, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 557-73.  On August 14, 2007, the ALJ found plaintiff not disabled.  Tr. 10-21.  The Appeals Council denied plaintiff's request for review of the ALJ's decision.  Tr. 6-9.

/ / /

---

     [1]  In a February 18, 2005 disability report form (SSA-3368), plaintiff lists her onset date as June 30, 2002.  Tr. 65.  No explanation is given for the discrepancy in onset dates.

2 - OPINION & ORDER

1                        FACTUAL BACKGROUND

2       Plaintiff alleges disability based on a severe skin condition

3  and the pain, itching, and other effects of this condition.  Tr.

4  18.  In her February 18, 2005 disability report form, she lists the

5  following as the illnesses, injuries, or conditions that limit her

6  ability to work:  "Nervousness, rashes, diabetes, high blood

7  pressure, OVARIAN CYST, MIGRAINE HEADACHES, ANXIETY, DEPRESSION,

8  ADD."  Tr. 65.

9       At the time of the July 17, 2007 hearing, plaintiff was

10 thirty-six years old.  Tr. 561.  She has an associate's degree in

11 liberal arts.  Tr. 571.  Her past relevant work is as an accountant

12 for an electrician, assistant to the director of nursing at a

13 college, medical billing assistant, retail cashier, chiropractor

14 assistant, customer service, microfiche technician, switchboard

15 operator, mail room clerk, and personal care attendant.  Tr. 66-68,

16 85-109, 114-25.

17 I.  Medical Evidence

18      The medical records begin with a November 10, 2001 emergency

19 room visit for a toothache.  Tr. 375-79.  There is no mention of

20 plaintiff's skin disorder other than her report of taking

21 prednisone, a glucocorticoid steroid used to treat skin conditions,

22 for allergies.  Id.  In a December 4, 2001 emergency room visit for

23 pain while urinating and a bad cough, she reported taking

24 prednisone for a skin rash.  Tr. 371.  The chart note from that

25 visit also reveals the presence of a diffuse, heavy, red rash which

26 plaintiff reported as chronic.  Id.

27      On August 3, 2002, plaintiff presented to the emergency room

28

3 - OPINION & ORDER

complaining of a flare-up of her eczema[2] and severe itching.  Tr. 359.  She reported a long-standing history of eczematous dermatitis for which she is usually on 20 milligrams of prednisone daily.  Id. However, she further reported that she stopped taking the prednisone when she found out she was pregnant, because of the possibility of it causing a cleft palate defect to the fetus as a result of first trimester exposure.  Id.  She wondered if she could now resume taking prednisone and an antihistamine, which she reported helped her intense itching.  Id.

On physical examination, the physician found generalized lichenification[3], particularly around the bilateral periorbital area of the face and the flexor creases of the upper and lower extremities.  Tr. 360.  There was erythema (diffused redness over the skin), with multiple abrasions caused by plaintiff's scratching, as well as shedding of the epidermis.  Id.  She was diagnosed with eczema, and advised to resume the 20 milligrams of prednisone daily, and to take the antihistamines Claritin or Benadryl for her severe itching.  Id.

Plaintiff appeared at the emergency room again on September 18, 2002, complaining of flu-like symptoms.  Tr. 355-57.  Her past

---

[2]  "Acute or chronic cutaneous inflammatory condition with erythema, papules, vesicles, pustules, scales, crusts, or scabs alone or in combination.  They may be dry or with watery discharge, with thickening, infiltration, and more or less itching or burning."  Taber's Cyclopedic Medical Dictionary 452 (Clayton Thomas ed., F.A. Davis, 14th ed. 1981).

[3]  Thick, leathery skin; usually the result of constant scratching and rubbing, and a common consequence of atopic dermatitis.  www.medterms.com; see also Taber's 815 (defining "lichenification" as "[c]utaneous thickening and hardening from continued irritation.").

4 - OPINION & ORDER

medical history mentions severe, diffuse eczema.   Tr. 356.   The chart note indicates she was taking prednisone and Benadryl.   Id. Her skin was noted to have chronic erythema with eczematous changes.   Id.

On November 12, 2002, plaintiff went to the emergency room for nasal congestion and throat swelling.   Tr. 352-53.   Her past medical history noted eczema, and the chart record states she was taking 20 milligrams of prednisone per day, as well as the antihistamine Zyrtec.   Tr. 353.   On physical examination, it was noted that she had a chronic, red rash over her face consistent with eczema.   Tr. 354.   Plaintiff was diagnosed with uvulitis and given antibiotics.   Id.

On February 27, 2003, plaintiff presented to the emergency room with a complaint of abdominal pain.   Tr. 349.   By this time, plaintiff had delivered her baby.   Tr. 350 (referring to her as postpartum, but no date of delivery noted).   Her past medical history states she had a history of chronic skin inflammation, involving the whole surface of the skin and characterized by redness and abundant shedding of the epidermis, for which she was on chronic prednisone therapy, Zyrtec, and a non-steroidal anti-inflammatory (NSAID) medication.   Id.   On physical examination, she had a generalized, erythematous skin eruption with scaling off of dead tissue, discolored spots of skin, and skin abrasions caused by scratching, with no signs of superinfection.   Tr. 351.   The physician's diagnosis and treatment related only to plaintiff's abdominal complaints, with no apparent treatment for her skin condition.   Id.

Plaintiff returned to the emergency room on March 17, 2003,

5 - OPINION & ORDER

for abdominal pain.  Tr. 342-48.  Her history included chronic
dermatitis, as well as her current medications of Zyrtec and
prednisone.  Tr. 343.  Her skin was reddened with scratch marks
over most of her body.  Tr. 344.  She had various radiological
studies performed in an effort to search for the cause of her pain.
An ovarian cyst was found on a pelvic ultrasound.  Tr. 348.  She
was discharged with acute abdominal pain of unclear etiology,
although possible early appendicitis is noted.  Tr. 342.  A report
dated the following day states that the appendix was normal.  Tr.
340.  Another report dated the next day indicates she had bilateral
ovarian cysts.  Tr. 339.

On July 26, 2003, plaintiff went to the emergency room for
body aches, a total body rash, and itching.  Tr. 324-25.  Plaintiff
was seven weeks pregnant and presented to the emergency room "with
an exacerbation of her eczema secondary to withdrawal from steroids
during her pregnancy."  Tr. 325.  On examination, her skin had
diffusely red, multiple epidermis abrasions, eczema from head to
toe, which was worse on the backs of her legs and the back of her
body.  Tr. 325.  She was treated in the emergency room with a
variety of medications including NSAIDs, antihistamines,
corticosteroids, opiod analgesics, and anti-anxiety medications.
Id.  She had  "excellent results."  Id.

On August 2, 2003, plaintiff was admitted to the hospital for
treatment of cellulitis.  Tr. 319.  She had a diffuse body rash and
severe itching.  Id.  She also had some skin breakdown with scabs
all over her body including her trunk, extremities, chest, and
abdomen.   Tr. 320.   The assessment was severe eczema and
cellulitis.  Id.  She was treated with intravenous antibiotics,

6 - OPINION & ORDER

anti-anxiety    medication    (also    used    to    treat    itching),
corticosteroids, and Dilaudid or morphine for pain.    Id.

On September 19, 2003, plaintiff presented to a different
hospital's emergency room because of pain and itching. Tr. 251-54.
The impression was of an exacerbation of her chronic dermatitis.
Tr. 252.   She was prescribed an antihistamine, an anti-anxiety
medication, and a corticosteroid mediation.   Tr. 253-54.

She returned to the emergency room on September 30, 2003,
because of itching.   Tr. 248.   The impression was of severe
dermatitis.  Id.  She was again prescribed the same medications.
Tr. 248-50.  She was discharged home with instructions to follow up
with a high-risk obstetrician that date.  Tr. 250.

Plaintiff returned to the emergency department twice in
October 2003 for dermatitis exacerbations. Tr. 240-47. On October
4, 2003, the impression was of chronic dermatitis with recurrent
exacerbations associated with pregnancy. Tr. 245. She was given
the same medications she received in her prior visits.  Tr. 247.
On October 8, 2003, she presented with complaints of itching and
red skin.  Tr. 241.  The impression this time was of severe
dermatitis and severe itching.  Id. She was given an antihistamine
and a corticosteroid. Tr. 243. On November 5, 2003, plaintiff's
skin was reported to be pink with no breakdown.  Tr. 238.

On January 14, 2004, plaintiff returned to the emergency room
with a generalized rash. Tr. 230.  At the time, she was taking
prednisone, an antihistamine, and an anti-anxiety medication.  Id.
The  impression  was  noted  as  severe  dermatitis  and  "toxic"
dermatitis.  Tr. 230.  Plaintiff was given a corticosteroid, an
antihistamine, and morphine.  Tr. 232.

7 - OPINION & ORDER

On January 20, 2004, plaintiff delivered her next child, by cesarean section, at approximately 34 weeks gestation as a result of fetal distress.  Tr. 217-18, 220.

On May 22, 2004, plaintiff returned to the emergency room for itching and redness, having run out of her prednisone three days earlier.  Tr. 207-08.  She had diffuse eczema to her torso and received an antihistamine and prednisone.  Tr. 208.  On June 17, 2004, her skin was reported as pink and flushed, but with no breakdown.  Tr. 203.

On February 14, 2005, plaintiff reported to the emergency room with a rash.  Tr. 276.  She had run out of her medications two days earlier.  Id.  She had a diffuse erythematous rash, very dry and flaky skin, and evidence of lichenification with linear scratch marks scattered on her legs and arms.  Tr. 277.  After thirty minutes of intravenous medication, she was markedly improved.  Id. She was discharged with a prescription for prednisone, 30 milligrams daily.  Id.  She was instructed to follow-up with her regular physician to arrange for a referral for allergy testing. Id.

In April 2005, plaintiff was pregnant again, this time with twins.  Tr. 265, 271.  On April 21, 2005, she presented to the emergency room complaining of a rash.  Tr. 271.  She was quoted in the chart note from that visit as saying that "my rash always gets worse when I'm pregnant."  Id.  Plaintiff received medications, a prescription for an antihistamine and prednisone, and instructions to follow up with her primary care provider.  Tr. 269.

Dr. Beatrice C. Kalata, M.D., had been plaintiff's treating physician from September 20, 2001, to June 30, 2004.  Tr. 280.

8 - OPINION & ORDER

Curiously, none of her office visit chart notes are in the record. Plaintiff offers no explanation for the omission. However, there is a statement from Dr. Kalata dated May 25, 2005, in which she states that she first saw plaintiff on September 20, 2001, for complaints of chronic rashes all over her body. Id. The last time she saw plaintiff was June 30, 2004. Id. Dr. Kalata includes a review of systems and diagnoses, without citing to a particular date on which they were rendered. Id. She notes that plaintiff had multiple red, elevated areas on her upper and lower extremities. Id. She diagnosed her as having chronic urticaria[4] and atopic dermatitis. Id. At the time of her writing, May 25, 2005, Dr. Kalata had heard that plaintiff was seeing another doctor for her skin problem. Id. She also stated that plaintiff's prognosis was guarded. Id.

Plaintiff moved from California to Oregon in the late spring of 2005 and saw Dr. Stephen L. Nelson, M.D., at the Family Practice Group in Medford on June 18, 2005. Tr. 461. The chart note lists Dr. Ashley Peterson as plaintiff's primary care provider. Id. Plaintiff saw Dr. Nelson for a problem unrelated to her skin, but his chart note remarks that her skin was diffusely pink. Tr. 462.

On August 17, 2005, Dr. Jeri Mendelson, M.D., a dermatologist, saw plaintiff for her atopic dermatitis. Tr. 540. Plaintiff was still pregnant with twins. Id. Plaintiff reported that she had had the skin condition most of her life and the only thing that made it better was steroid use. Id. She referred to having used

---

[4] "A vascular reaction of the skin characterized by the eruption of pale evanescent wheals, which are associated with severe itching." Taber's 1523.

9 - OPINION & ORDER

1  some topicals in the past and a worsening of the condition in the
2  winter.  Id.

3      Plaintiff was currently taking prednisone and Benadryl.  Tr.
4  540.  The physical examination revealed erythema and scaling in
5  large plaques on both upper extremities, the chest, upper back,
6  abdomen, and the lower extremities.  Id.  Plaintiff also had
7  lichenification of the eyelids, on the central cheeks, and on the
8  upper forehead.  Id.  She had redness with scale there as well.
9  Id.  The rest of the face, eyelids, scalp, lips, and neck were
10 clear.  Id.

11     In her assessment and plan, Dr. Mendelson remarked that
12 plaintiff was weaning off prednisone.  Id.  Dr. Mendelson gave
13 plaintiff an anti-inflammatory steroid medication in cream or
14 lotion form, for her body.  Id.  She also put plaintiff "in UVB
15 narrowband."  Id.  She further recommended that plaintiff use 1%
16 hydrocortisone (a topical corticosteroid medication) on her face.
17 Id.  Plaintiff was to return to the clinic as necessary.  Id.

18     On August 22, 2005, plaintiff called and reported to Dr.
19 Mendelson that she had "mixed connective tissue disease."  Tr. 539.
20 Dr. Mendelson noted that "[w]e have been treating her in
21 correspondence with Dr. Dryland with several medications."  Id.
22 There are no records in the administrative record of any visit with
23 Dr. Dryland.  In her chart note entry regarding this phone call,
24 Dr. Mendelson noted that plaintiff takes 40 milligrams of
25 prednisone daily and reported she was out.  Id.  She was going to
26 call in a prescription of 80, 10-milligram pills, with refills.
27 Id.  Plaintiff was to follow-up as necessary.  Id.

28     On September 13, 2005, Dr. Mendelson's office entered the

10 - OPINION & ORDER

following in plaintiff's chart:

> 9/13/5: [Plaintiff] called today wanting Dr. Mendelson
> to fill out papers so [plaintiff] could collect
> disability due to her skin cond. [A]fter speaking w/ Dr.
> Mendelson, this is not anything that she thinks should be
> done. [P]t was not very happy hearing this [and] she
> states she had recieved [sic] disability for this for the
> past 7 years. I again told her this is nothing that Dr.
> Mendelson is willing to do. She could ask her [primary
> care] doc. [P]t will [follow up as needed].

Tr. 539.

On September 16, 2005, plaintiff saw Dr. George E. Campbell, D.O., in Jacksonville, Oregon, to establish care and to seek treatment for right wrist pain. Tr. 533-34. At the time, she was twenty-eight weeks pregnant with twins. _Id._

On November 15, 2005, Dr. Campbell saw plaintiff for two conditions which arose during her pregnancy. Tr. 531. She had delivered her twins by caesarean section two weeks earlier. _Id._ First, he noted that she was hypertensive during the third trimester. _Id._ Dr. Campbell assessed her as having postpartum hypertension. _Id._ He continued her on an anti-hypertension medication. _Id._

Dr. Campbell also noted that plaintiff had developed gestational diabetes while pregnant. _Id._ He assessed her with postpartum hyperglycemia, rule out diabetes. _Id._ He also noted that she was taking 40 milligrams of prednisone daily, for her eczema, which she had been doing for a number of years. _Id._ He indicated that plaintiff needed to explore alternatives to glucocorticoid therapy if she appeared to be persistently hyperglycemic. _Id._

On January 20, 2006, plaintiff reported experiencing chest pain. Tr. 529. Dr. Campbell indicated that plaintiff now had

11 - OPINION & ORDER

persistent adult onset non-insulin dependent diabetes.  Id.  She
was still hypertensive as well.  Id.  However, in the problem list
portion of the chart, he noted that the hypertension was "benign
essential" and that the diabetes was borderline.  Tr. 528.

     On January 30, 2006, Dr. Campbell noted that plaintiff
presently had a lichenified rash involving the arms and anterior
upper trunk areas, neck, and face, with no secondary infection.
Tr. 523.  He prescribed the same non-steroidal lotion that Dr.
Mendelson had prescribed, to be applied twice per day.  Id.

     On February 9, 2006, Dr. Campbell noted plaintiff's eight-year
history of taking 40 milligrams of prednisone daily.  Tr. 521.  He
noted that her dermatitis on that date was "rather marginally
controlled."  Id.  He noted that in the past, she had tried a
different non-steroidal cream intended to relieve mild to moderate
eczema symptoms, which reduced inflammation, but caused itching.
Id.  He also noted that in the past, she had not seen either an
endocrinologist or a rheumatologist.  Id.  He encouraged her to see
her dermatologist again.  Id.  He noted the possibility of a
rheumatology and endocrinologist referral, but decided to wait
until she saw the dermatologist.  Id.

     On February 16, 2006, plaintiff went to Dr. Campbell to follow
up regarding her diabetes and to discuss social security.  Tr. 517.
Dr. Campbell noted a flare up of her dermatitis, including a
"recrudescence of inflammatory dermatitis" which was bodywide.  Tr.
518.  He noted that this "appears to be her typical pattern only
with exacerbation."  Id.  There was no secondary infection.  Id.
Dr. Campbell increased her prednisone to 60 milligrams per day
until "response" was obtained, followed by tapering by 1 milligram

12 - OPINION & ORDER

every two to three days.  Id.

On March 9, 2006, Dr. Campbell noted that plaintiff's atopic dermatitis was long standing and required ongoing corticosteroids for treatment.  Tr. 515.  He further noted that her prednisone dose was back to 40 milligrams daily and that her dermatitis was "back to baseline."  Tr. 516.

On March 14, 2006, Dr. Campbell wrote a letter to plaintiff's attorney.  He stated:

> I . . . have been treating Ms. Anderson since September 16, 2005.  Approximately ten years ago she was diagnosed with a severe and resistant form of atopic dermatitis which has required longterm fairly high dose corticosteroids for treatment.  It has become apparent that this condition, with marginally effective treatment for it, resulted in a significant effect on this patient's ability to perform normal job functions and indeed day to day activities of daily living.  She finds it difficult to perform chores about the house and is ultrasensitive to household products.  Her last work experience was in 2002 as a medical front office person. She had to stop due to severe and unremitting dermatitis (Code 8.05).  In addition she has significant side effects to corticosteroids:  elevated blood pressure, elevated blood sugar, weightgain, loss of visual acuity, decreased ability to concentrate, mood fluctuations, difficulty writing and in some cases, difficulty walking. At this point the estimated longterm prognosis is continuation of the above detailed symptoms for at least the next twelve months and in all likelihood this appears to be developing into a lifelong condition.  She also requires ongoing consultation with a dermatologist with increased frequency of surveillance due to the necessity of taking high dose corticosteroids for the condition. In my opinion the above medical condition suggests that she would be an appropriate candidate for Social Security disability.

Tr. 404.

On May 19, 2006, plaintiff returned to Dr. Peterson at the Family Practice Group in Medford.  Tr. 485.  Interestingly, the chart note indicates that she did not have a primary care physician at the time, even though she had previously seen Dr. Nelson at that

13 - OPINION & ORDER

clinic eleven months before and Dr. Nelson's chart note referred to
Dr. Peterson as plaintiff's primary care physician.   And, until
recently, she had been cared for by Dr. Campbell in Jacksonville.
At her visit with Dr. Peterson, plaintiff complained of migraines.
Id.  She was seventeen weeks pregnant.  Id.  She stated that her
migraine frequency had increased during pregnancy.  Id.  She was
given oxycodone and ibuprofen.  Id.  There is no mention of any
skin condition or skin medications.  Id.

     On September 14, 2006, plaintiff delivered her baby by
caesarean section at approximately thirty-four weeks gestation
because of placenta previa/accreta.[5]  Tr. 423-24.  Surgical notes
from the delivery and the hysterectomy performed at that time state
that plaintiff's ovaries were normal.  Tr. 422, 423-24.

     On December 8, 2006, plaintiff saw Dr. Tom Margulies, M.D., at
the Family Practice Group in Medford for sciatic pain, and pain
radiating to her thigh.  Tr. 480-81.  Plaintiff reported a history
of  severe  eczema,  requiring  hospitalizations  for  intravenous
steroids, and a ten-year use of prednisone.  Tr. 481.  She also
reported having no known complications as a result of the steroid
therapy.  Id.  Given her long-term use of steroids, Dr. Margulies
was  concerned  that  she  had  a  compression  fracture  or  other
pathologic disorder of the lumbar spine.  Tr. 482.  He also thought
it was possible that she had a ruptured disk.  Id.  He planned to
ask the Oregon Health Plan to pre-authorize physical therapy and an

---

     [5]  Placenta previa is a placenta which is implanted in the
lower uterine segment.  Placenta accreta is a placenta which has
invaded the musculature of the uterus and as a result, separation
of the placenta is very difficult or impossible.  Taber's 1107-
08.

14 - OPINION & ORDER

MRI.  Id.

The MRI revealed mild stenosis at L1-2 through L4-5.  Tr. 489.
There was also mild bilateral foraminal narrowing at L3-4 through
L5-Si.  Id.  No focal neural impingement was seen.  Id.  There were
no findings to definitively explain the right radiculopathy.  Id.

X-rays were negative and revealed no compression fractures or
subluxations.  Tr. 490.

On January 31, 2007, plaintiff saw Dr. Peterson to follow-up
on her complaints of migraines.  Tr. 474.  She complained of
headaches approximately twice per month, with Percocet (a brand
name of a drug containing both oxycodone and acetaminophen),
helping sometimes, but not always.  Id.  On physical examination,
Dr. Peterson noted plaintiff's "[p]rofound exzematous changes" on
plaintiff's face, neck, and arms.  Id.

Dr. Peterson continued to recommend Percocet, ibuprofen, and
an NSAID for plaintiff's migraines, as well as Maxalt, a drug used
to treat acute migraine headaches.  Tr. 476.  For the dermatitis,
she advised plaintiff to try and use creams as much as possible to
reduce the use of oral steroids.  Id.  Dr. Peterson dropped
plaintiff's prednisone prescription to 30 milligrams per day and
ordered an anti-inflammatory cream called Lidex to be applied twice
daily on her body, as well as a non-steroidal lotion to use twice
daily on her face.  Id.  She also ordered her to have an allergy
profile obtained.  Id.

On March 13, 2007, plaintiff saw Dr. Peterson again, to
follow-up from her previous visit.  Tr. 469.  They discussed her
diabetes and her use of prednisone.  Id.  Plaintiff reported that
she tried to go to 30 milligrams per day of prednisone, but her

15 - OPINION & ORDER

1  eczema flared up when she did so.   Id.   Her allergy screen was

2  negative.   Id.   Dr. Peterson strongly advised her to try to taper

3  the prednisone to 35 milligrams daily.   Id.   She also recommended

4  that plaintiff start taking Glucophage, an oral diabetes medication

5  used to control blood sugar, and work on her diet.   Id.

6       The next day, March 14, 2007, plaintiff returned to the Family

7  Practice Group and saw Physician's Assistant Denise Ledbetter for

8  follow up on some lab tests.   Tr. 465.   Ledbetter remarked that

9  plaintiff's eczema was stable.   Id.   On physical examination,

10  Ledbetter noted an eczematous rash on the flexor areas of

11  plaintiff's arms and legs.   Id.

12       On March 27, 2007, plaintiff met with diabetes educator Joy

13  Cook, R.N., at the Asante Diabetes Care Center.   Tr. 491.

14  Plaintiff reported that she had not been testing or managing her

15  diabetes since her last baby was born six months earlier.   Id.   She

16  further reported that she began taking Glucophage one week earlier,

17  with no unpleasant side effects.   Id.   Cook reviewed basic diet

18  information with plaintiff and gave her written information as

19  well.   Id.   Plaintiff was instructed to return in one month with

20  blood sugar and food logs so her control could be evaluated.   Id.

21  There is nothing in the record suggesting plaintiff did return as

22  requested.

23       Plaintiff saw Dr. Mendelson again on May 1, 2007, for a skin

24  examination following the excision of a squamous cell carcinoma

25  from her arm.   Tr. 538.[6]   Dr. Mendelson noted that plaintiff had

26  _____

27       [6]  Because the record does not contain any medical records
    from the excision procedure itself, it is unknown who performed
28  it.

16 - OPINION & ORDER

1    severe dry skin at the time, for which she recommended Cetaphil

2    cream.  Id.  She discussed getting plaintiff off prednisone.  Id.

3    Her chart note ends by stating that she would see plaintiff back

4    again as necessary.  Id.  There are no further medical records.

5    II.  Plaintiff's Testimony

6        At the hearing, plaintiff testified that she had seven

7    children, ages thirteen, eleven, four, three, twenty-month old

8    twins, and a ten-month old.  Tr. 562.  She can write, unless her

9    hands are cracked making it hard to hold a pen, and she can perform

10   basic addition and subtraction.  Tr. 562-63.

11       She testified that she had worked since her alleged onset

12   date, from October 2005 to February 2006, at "Bear Creek" a call

13   center for orders to Harry and David, a mail-order food company.

14   Tr. 563.  She had problems wearing the headset because of sores on

15   her ears, behind her ears, and the side of her face.  Id.  She was

16   let go because she had too many days and hours that she had missed

17   work, and she could not work a full day.  Tr. 564.

18       Plaintiff testified that she is unable to work because she

19   sleeps poorly as a result of itching and scratching throughout the

20   night, and has difficulty wearing clothes.  Id. As a result, she

21   often dresses in a mu-mu, or a light sarong, or something that is

22   not binding to her body.  Id.  She constantly has creams and

23   ointments on and is in and out of the shower.  Id.  She said she

24   cannot get dressed professionally on a regular basis.  Id.

25       Her skin feels hot and itchy and as a result of scratching,

26   she gets lesions that burn.  Tr. 565.  When they heal, they itch

27   more, creating a burning and itching cycle.  Id.  The lesions go

28   from one spot to another, including her neck, her back, and then

17 - OPINION & ORDER

1   her whole body.  *Id.*  The problem is systemic.  *Id.*

2      Plaintiff cannot do many house chores because she cannot have

3   her hands submerged in water.  Tr. 566.  Thus, she said she can do

4   no diaper changes and no dishes.  *Id.*  She cannot cook because it

5   requires too much time standing on her feet, which are cracked

6   because of dryness.  *Id.*  She requires the use of a particular

7   detergent for her clothes and is restricted to wearing clothes of

8   a material that breathes.  Tr. 567.  She spends a lot of time in a

9   cold shower, then lying on the bed naked with a fan, then applying

10  creams and ointments or gels.  Tr. 568.

11     Plaintiff noted that her ten-year history is one of taking

12  high doses of steroids to control the condition, then concern by

13  medical professionals about the high dose and recommendations that

14  she "come off" the drug, followed by a hospitalization for a flare-

15  up after which she is placed on the high dose again.  Tr. 569.  She

16  again noted that she gets lesions on her hands and feet, and the

17  longest she has responded to treatment has been one to two days.

18  Tr. 570.

19  III.  Vocational Expert Testimony

20     Vocational Expert (VE) Lynn Jones testified at the hearing.

21  She noted plaintiff's past relevant work of order clerk, customer

22  service work, and chiropractor assistant.  Tr. 571.  The ALJ

23  presented the following hypothetical to the VE:  a thirty-six year

24  old person with plaintiff's education and past relevant work, who

25  would miss more than two days of work per month on a routine basis.

26  *Id.*  In response, the VE stated that competitive employment was

27  ruled out for such a person.  *Id.*

28  / / /

18 - OPINION & ORDER

THE ALJ'S DECISION

The ALJ first determined that because of a previous disability application by plaintiff which she did not appeal following a denial on reconsideration, and because plaintiff presented no new and material evidence justifying the reopening of that prior application, plaintiff's onset date was no earlier than May 10, 2001. Tr. 13. References by the ALJ to medical or other evidence before the May 10, 2001 date were only for the purposes of establishing the nature and extent of plaintiff's impairments and addressing credibility. Id.

Next, the ALJ concluded that plaintiff had engaged in disqualifying substantial gainful work activity from December 1, 2001, through November 30, 2002. Tr. 16. Plaintiff does not object to this finding.

Following his finding that plaintiff's dermatitis was a medically determinable impairment, the ALJ concluded that it was not "severe" within the meaning of the regulations and that plaintiff did not have a severe impairment or combination of impairments. Tr. 16. Although explained in more detail below in the discussion section of this Opinion, generally speaking, the ALJ based his finding on three conclusions: (1) that because the exacerbations primarily occurred while plaintiff was pregnant, but still promptly responded to medical treatment, and because other flare ups occurred when she ran out of her medications, "her symptoms are largely volitional, and even when episodically active, they have been quickly controlled by medications"; Tr. 18; (2) the record supported the opinion of treating dermatologist Dr. Mendelson that the skin condition does not prevent plaintiff from

19 - OPINION & ORDER

1  working; and (3) plaintiff's inconsistent statements and actions
2  undermined her credibility.  Tr. 18.

3      Because the ALJ concluded that plaintiff did not have a severe
4  impairment that significantly limited her ability to perform basic
5  work activities, she was not disabled under the statute.  Tr. 21.

6              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

7      A claimant is disabled if unable to "engage in any substantial
8  gainful activity by reason of any medically determinable physical
9  or mental impairment which . . . has lasted or can be expected to
10 last for a continuous period of not less than 12 months[.]"  42
11 U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according
12 to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395
13 (9th Cir. 1991).    The claimant bears the burden of proving
14 disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
15 1989).  First, the Commissioner determines whether a claimant is
16 engaged in "substantial gainful activity."  If so, the claimant is
17 not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
18 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner
19 determines whether the claimant has a "medically severe impairment
20 or combination of impairments."  Yuckert, 482 U.S. at 140-41; see
21 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
22 disabled.

23     In step three, the Commissioner determines whether the
24 impairment meets or equals "one of a number of listed impairments
25 that the [Commissioner] acknowledges are so severe as to preclude
26 substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20
27 C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is
28 conclusively presumed disabled; if not, the Commissioner proceeds

20 - OPINION & ORDER

to step four.  Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla," but "less than a preponderance."  Id.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.

                                DISCUSSION

Plaintiff contends that the ALJ made the following errors in determining that she did not have a severe impairment:  the ALJ improperly rejected her testimony, improperly rejected Dr. Campbell's opinion, and based his decision on his own opinion without considering the record as a whole.  Plaintiff also argues that after the error at step two, the ALJ further erred by failing to find that plaintiff's impairment(s) met or equaled a listed impairment at step three.

/ / /

21 - OPINION & ORDER

I.  Step Two Arguments

     The ALJ considers the severity of the claimant's impairment(s) at step two.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement, or a combination of impairments that is severe and meets the duration requirement, the claimant is not disabled.  Id.

     A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, etc..  20 C.F.R. §§ 404.1521(b), 416.921(b).  In Social Security Ruling (SSR) 96-3p (available at 1996 WL 374181, at *1), the Commissioner has explained that "an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."

     The Ninth Circuit has explained that the step two severity determination is expressed "in terms of what is 'not severe.'" Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  The ALJ is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity.  Id.  Importantly, as the Ninth Circuit noted, "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  Id. (citing Yuckert, 482 U.S. at 153-54).

     "[T]he severity regulation is to do no more than allow the [Social Security Administration] to deny benefits summarily to

22 - OPINION & ORDER

1   those applicants with impairments of a minimal nature which could

2   never prevent a person from working." SSR 85-28 (available at 1985

3   WL 56856, at *2) (internal quotation omitted). Therefore, "an ALJ

4   may find that a claimant lacks a medically severe impairment or

5   combination of impairments only when his conclusion is 'clearly

6   established by medical evidence.'" Webb v. Barnhart, 433 F.3d 683,

7   687 (9th Cir. 2005) (quoting SSR 85-28). The court's task in

8   reviewing a denial of benefits at step two is to "determine whether

9   the ALJ had substantial evidence to find that the medical evidence

10  clearly established that [the claimant] did not have a medically

11  severe impairment or combination of impairments." Id.

12          A.   Plaintiff's Testimony

13          The ALJ rejected plaintiff's subjective testimony based on

14  several reasons discussed below.   Plaintiff argues that the ALJ's

15  reasons are not clear and convincing.  I disagree.

16          The ALJ is responsible for determining credibility. Andrews

17  v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). Once a claimant

18  shows an underlying impairment and a causal relationship between

19  the impairment and some level of symptoms, clear and convincing

20  reasons are needed to reject a claimant's testimony if there is no

21  evidence of malingering. Smolen, 80 F.3d at 1281-82. When

22  determining the credibility of a plaintiff's complaints of pain,

23  the ALJ may properly consider several factors, including the

24  plaintiff's daily activities, inconsistencies in testimony,

25  effectiveness or adverse side effects of any pain medication, and

26  relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750

27  (9th Cir. 1995). The ALJ may also consider the ability to perform

28  household chores, the lack of any side effects from prescribed

23 - OPINION & ORDER

1  medications, and the unexplained absence of treatment for excessive

2  pain when determining whether a claimant's complaints of pain are

3  exaggerated.  Id.

4      The ALJ first found that plaintiff's seeking a disability

5  opinion from Dr. Campbell after Dr. Mendelson refused to provide

6  her with one, was "doctor shopping" which undermined her

7  credibility.  Tr. 21.  The record supports the ALJ's finding.

8      Soon after plaintiff moved to Oregon in June 2005, she sought

9  treatment from the Family Practice Group in Medford, where she

10 lived.  Tr. 461.  She then saw Dr. Mendelson in August 2005.  Tr.

11 540.   After only one visit and one telephone call, plaintiff

12 requested a disability opinion from Dr. Mendelson in September

13 2005, and Dr. Mendelson refused to provide her with one.  Tr. 539.

14 Plaintiff then started seeing Dr. Campbell, apparently as her

15 primary care physician, in Jacksonville, even though she had seen

16 someone in Medford, closer to where she lived, only a couple of

17 months before.  Tr. 533-34.  Then, after only several months of

18 seeing Dr. Campbell, and after obtaining the desired disability

19 opinion she requested from him, she returned to the Family Practice

20 Group in Medford in May 2006, reporting that she did not have a

21 primary care physician.  Tr. 485.  Despite several recommendations

22 to see her dermatologist, plaintiff never returned to Dr. Mendelson

23 for treatment of her skin problem, although she did see her in May

24 2007 for a skin check following the excision of a squamous cell

25 cancer lesion.  Tr. 538.

26     The ALJ's decision indicates that he viewed the September 13,

27 2005 chart note made by Dr. Mendelson's assistant, as an opinion by

28 Dr. Mendelson that plaintiff's skin condition was not disabling.

24 - OPINION & ORDER

Although the chart note at issue does not directly express Dr.
Mendelson's opinion, the ALJ's interpretation of the chart note is
not unreasonable. As such, I must accept it. Edlund v. Massanari,
253 F.3d 1152, 1156 (9th Cir. 2001) ("The ALJ is responsible for
determining credibility, resolving conflicts in medical testimony,
and resolving ambiguities"; "[i]f the evidence is susceptible to
more than one rational interpretation, the court may not substitute
its judgment for that of the Commissioner.").

Additionally, the ALJ's interpretation that plaintiff was
"doctor shopping" is not unreasonable. The string of facts with
plaintiff having initially started primary care in Oregon with the
Family Practice Group in Medford, then seeking treatment for her
skin condition from Dr. Mendelson, followed by starting care with
a different primary care practitioner in a more distant location
after Dr. Mendelson refused to provide plaintiff with a disability
opinion, followed by returning to the Family Practice Group in
Medford for primary care after obtaining the desired disability
opinion from Dr. Campbell, and not treating with Dr. Mendelson for
her skin condition again despite consistent advice to do so,
suggests plaintiff's actions were motivated by something other than
establishing care for the purposes of treatment. While that is not
the only possible interpretation of the facts, it is not an
unreasonable one. Accordingly, I accept it.

Next, the ALJ concluded that although plaintiff testified
that she was physically unable to care for herself, the record
noted her as a "homemaker." Tr. 21. The references cited by the
ALJ as showing plaintiff a "homemaker," are found in computerized
printouts from the Torrance Memorial Medical Center in Torrance,

25 - OPINION & ORDER

1  California, when plaintiff was treated in the emergency room.  Tr.
2  200 (June 2004), 229 (January 2004), 240 (October 2003).   The
3  printouts list information about the patient, the patient's
4  employer, health insurance, and physician, and admission
5  information.  Id.

6      There are two problems with the ALJ's reliance on these
7  records to discredit plaintiff's testimony.  First, there is no
8  indication that plaintiff herself provided the term "homemaker."
9  It is simply listed in the employer section as her occupation, with
10 other employer-related information blank.  Id.  Plaintiff may well
11 have described her situation as staying home with children, which
12 someone else described as "homemaker."

13     Second, while the term "homemaker" carries some implication of
14 tending to a home, and perhaps children, the simple listing on a
15 computerized form of the word "homemaker" insufficiently describes
16 what was meant by that word.  It reveals nothing about her daily
17 activities.  The term, without more, is not descriptive of what
18 plaintiff was actually able to do physically at that time.
19 Therefore, I agree with plaintiff that this particular reason for
20 rejecting plaintiff's testimony is not clear and convincing.

21     The third reason given by the ALJ for rejecting plaintiff's
22 testimony is that the record referred to plaintiff being a student,
23 undermining evidence that she is unable to do anything other than
24 take care of her children.  Tr. 21.  The reference to plaintiff
25 attending school is in a March 13, 2007 chart note from an
26 emergency room visit by plaintiff for a left foot sprain.  Tr. 457.
27 The record indicates that as a result of the foot injury, plaintiff
28 was going to rely on a wheelchair rather than crutches for mobility

1   because she was in school and would be unable to carry books and

2   walk between classes on crutches.   Id.

3       The record supports the ALJ's determination that plaintiff's

4   status as a student undermines her credibility.   In addition to

5   evidence that she could do few chores and spent time only tending

6   to her children, plaintiff herself testified at the hearing that

7   (1) she had trouble writing when her hands were cracked, (2) she

8   was unable to work for a variety of reasons including poor sleep,

9   inability to wear professional clothes, the need to be in and out

10  of the shower, the need to lie naked on her bed with a fan, and (3)

11  her constant itching causing burning lesions, and that she could

12  not be on her feet.   The fact that only two months prior to giving

13  this testimony, plaintiff was a student taking what appears to be

14  more than one class, contradicts the evidence regarding her

15  limitations and is a clear and convincing basis upon which to find

16  her limitations testimony not credible.

17      The last reason given by the ALJ for rejecting plaintiff's

18  testimony is her failure to follow up with the dermatologist and

19  her non-compliance in seeking treatment with an allergist.   Tr. 21.

20  The ALJ cites to Dr. Mendelson's August 17, 2005 chart note of

21  plaintiff's first visit with Dr. Mendelson.   Tr. 540.   After

22  prescribing a course of treatment, Dr. Mendelson stated that

23  plaintiff would return to the clinic as necessary.   Id.

24      Although the record unquestionably shows that plaintiff

25  continued to have problems with her skin, she never returned to see

26  Dr. Mendelson for her skin problem.   She called once to report that

27  she was out of prednisone and another time to request a disability

28  opinion, but she did not return to see Dr. Mendelson for treatment

27 - OPINION & ORDER

of dermatitis.  When she did see Dr. Mendelson again, in May 2007, it was for a skin cancer issue, not her chronic dermatitis condition.  Plaintiff's failure to continue treatment with Dr. Mendelson shows, at a minimum, a lack of effort by plaintiff to pursue care from a specialist.

The ALJ next cites to Dr. Campbell's February 9, 2006 note in which he encourages her to return to her dermatologist for treatment.  Tr. 521.  Plaintiff failed to follow his advice.  He also encouraged her to see a rheumatologist and an endocrinologist. Id.  He indicated he would wait to make those referrals until after plaintiff had seen the dermatologist.  Plaintiff's failure to follow up with dermatology as Dr. Campbell recommended precluded her from obtaining referrals to other specialists who might have offered different treatment for plaintiff's skin condition.

As for the allergist, an emergency room physician treating plaintiff in February 2005 advised plaintiff to obtain an allergy referral from her primary care physician.  Tr. 277.  Plaintiff apparently never did so until more than two years later when it was arranged by Dr. Peterson.

It is not unreasonable to view plaintiff's repeated failures to follow up with specialists as revealing that she is more interested in being found disabled than in obtaining effective treatment.  The ALJ did not err in finding her not credible for failing to pursue these recommendations.  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment to reject testimony regarding severity of symptoms).

28 - OPINION & ORDER

1    The ALJ did not err in rejecting plaintiff's subjective
2  testimony based on finding her not credible.  Even though one of
3  the reasons supplied by the ALJ is not supportable, the ALJ
4  provided other clear and convincing reasons, supported by
5  substantial evidence in the record, for his decision.  This is
6  sufficient.  Batson v. Commissioner, 359 F.3d 1190, 1197 (9th Cir.
7  2004) (substantial evidence still supported ALJ's credibility
8  determination even though ALJ erred in making one assumption not
9  supported by the record).  Here, the ALJ did not base his decision
10 on his own opinion or fail to consider the whole record.

11    B.  Dr. Campbell's Opinion

12    Plaintiff argues that the ALJ improperly rejected Dr.
13 Campbell's March 2006 opinion in which he stated that plaintiff was
14 limited by her skin condition and the side effects of her
15 medication, and was a good candidate for disability.  Tr. 404.

16    Social security law recognizes three types of physicians:  (1)
17 treating; (2) examining; and (3) nonexamining.  Lester v. Chater,
18 81 F.3d 821, 830 (9th Cir. 1996).  Generally, more weight is given
19 to the opinion of a treating physician than to the opinion of those
20 who do not actually treat the claimant.  Id.

21    If the treating physician's opinion is not contradicted, the
22 ALJ may reject it only for "clear and convincing" reasons.  Id.
23 Even if the treating physician's opinion is contradicted by another
24 doctor, the ALJ may not reject the treating physician's opinion
25 without providing "specific and substantial reasons" which are
26 supported by substantial evidence in the record.  Id.

27    The ALJ gave several reasons for rejecting Dr. Campbell's
28 opinion.  First, he noted that Dr. Campbell had treated plaintiff

29 - OPINION & ORDER

for only seven months, during which time plaintiff had experienced only two skin exacerbations.    Tr. 20.    The weight accorded a treating physician's opinion depends on the length of the treatment relationship, the frequency of visits, and the nature and extent of treatment received.    20 C.F.R. §§ 404.1527(d)(2)(i), (ii), 416.927(d)(2)(i), (ii).

The record shows that Dr. Campbell saw plaintiff seven times during his seven-month relationship with her, and that her skin condition was not her chief complaint or reason for the visit on any of those occasions.    Tr. 533 (September 15, 2005 visit to establish care and address right wrist pain); Tr. 530 (November 15, 2005 visit to address hypertension and diabetes which occurred during previous pregnancy); Tr. 529-30 (January 20, 2006 visit to follow up on hypertension and diabetes and report chest pain); Tr. 522-23 (January 30, 2006 visit to follow up on laboratory tests, complaint of right ankle pain); Tr. 521 (February 9, 2006 visit to follow up on dipyridamole thallium scan regarding potential heart problems); Tr. 517-18 (February 16, 2006 visit to follow up on diabetes and discuss social security); Tr. 515 (March 9, 2006 visit to discuss social security paperwork).

Although Dr. Campbell noted plaintiff's chronic dermatitis, described her skin condition, and prescribed medications for the condition, his primary treatment relationship with plaintiff was for issues and concerns other than her dermatitis.    During the time he saw her, she experienced two flare-ups which Dr. Campbell noted. Tr. 523 (January 30, 2006); Tr. 518 (February 16, 2006).    However, neither time was that the basis for her appointment with him.

There is no question that Dr. Campbell was a treating

30 - OPINION & ORDER

physician.    But,  the  ALJ's  interpretation  of  the  evidence  as
indicating  that  Dr.  Campbell's  opinion  is  entitled  to  little  or  no
weight  because  the  treatment  relationship  was  relatively  short  and
because  the  nature  of  the  relationship  was  generally  for  non-skin
related  conditions,  is  supported  by  the  record.    The  ALJ  did  not
err  in  this  regard.

Next,  the  ALJ  rejected  Dr.  Campbell's  opinion  because  Dr.
Campbell  had  accepted  at  face  value  that  plaintiff  had  ceased  her
last  job  because  of  her  skin  condition,  but  Dr.  Campbell  did  not
have  the  benefit  of  the  record  showing  that  she  stopped  working
when  she  was  three  months  pregnant.    Tr.  20.

The  job  referred  to  by  Dr.  Campbell  was  one  of  medical  "front
office  person,"  a  position  plaintiff  held  in  2002.    Tr.  404.
Although  the  ALJ  miscalculated  how  pregnant  plaintiff  was  when  she
left  the  position  in  November  2002,  Tr.  359  (August  3,  2002  chart
note  referring  to  plaintiff's  twelve-week  pregnancy,  making  her
approximately  seven  months  pregnant  in  November  2002),  the  ALJ
appropriately  noted  that  when  Dr.  Campbell  rendered  his  opinion  as
to  plaintiff's  disability,  and  in  particular,  when  he  noted  in  that
opinion  that  plaintiff  stopped  working  in  2002  because  of  her  skin
condition,  Dr.  Campbell  had  no  evidence  regarding  plaintiff's
reason  for  quitting  her  job  other  than  plaintiff's  self-report.

The  ALJ  may  reject  a  treating  physician's  opinion  when  that
opinion  is  based  on  the  plaintiff's  subjective  complaints  and  when
the  ALJ  has  properly  rejected  the  plaintiff's  subjective  testimony.
See  Tonapetyan  v.  Halter,  242  F.3d  1144,  1149  (9th  Cir.  2001)  (when
the  record  supported  the  ALJ  in  discounting  the  plaintiff's
credibility,  the  ALJ  was  free  to  disregard  the  physician's  opinion

31 - OPINION & ORDER

which was premised on the plaintiff's subjective complaints);
Morgan v. Commissioner, 169 F.3d 595, 602 (9th Cir. 1999) (A
physician's opinion of disability premised to a large extent upon
the claimant's own accounts of his symptoms and limitations may be
disregarded where those complaints have been "properly discounted)
(internal quotation omitted).

Because the ALJ has properly discounted plaintiff's testimony,
he may properly reject this basis of Dr. Campbell's opinion because
it relies on nothing but plaintiff's own report to Dr. Campbell.
Moreover, nowhere in Dr. Campbell's chart notes does he mention
plaintiff's skin condition affecting her ability to work or her
activities of daily living.  His chart notes reveal no notation of
her having to quit work in the past.  Additionally, the medical
records during the period leading up to late November 2002 when
plaintiff quit the medical front office person job, show no acute
exacerbations of her skin condition during that time.  Tr. 352-57.
Her last flare-up, almost four months before she quit work, was in
early August when she had stopped taking prednisone early in her
pregnancy.  Tr. 360.  Thus, the record as a whole supports the
ALJ's rejection of Dr. Campbell's statement, based on plaintiff's
self-report, that plaintiff's skin condition caused her to quit
work in 2002.

The ALJ next rejected Dr. Campbell's opinion because,
according to the ALJ, Dr. Campbell contradicted himself when he
noted significant side effects of plaintiff's treatment with
steroids, including elevated blood pressure, blood sugar, and
weight gain, in contrast to the record which showed that the
hypertension was benign and improved on medication, plaintiff had

32 - OPINION & ORDER

1   no cardiac disease, and the elevated blood sugar and weight gain
2   first appeared during pregnancy, a time when plaintiff used less or
3   no steroids.  Tr. 20.  Moreover, the ALJ noted that while plaintiff
4   was subsequently diagnosed with Type II diabetes, the record showed
5   that it was controlled with diet and medication.  Id.

6       I agree with the ALJ.  Contrary to what Dr. Campbell suggested
7   in his March 2006 opinion, Dr. Campbell's notes do not indicate
8   that the side-effects of plaintiff's prednisone use compromise
9   plaintiff's ability to work.  Indeed, there is no record of many of
10  the possible side effects ever afflicting plaintiff.

11      As the ALJ remarked, plaintiff's diabetes originally appeared
12  as gestational diabetes during pregnancy, Dr. Campbell referred to
13  it as borderline, and it was controlled with medication and diet.
14  Tr. 528.  The hypertension also appeared initially during pregnancy
15  and Dr. Campbell himself reported it as benign.    Tr. 528.
16  Plaintiff herself reported in December 2006 that she had no known
17  complications as a result of her long-term steroid therapy.  Tr.
18  481.  Thus, Dr. Campbell's opinion that the hypertension and
19  diabetes were caused by plaintiff's steroid use and that they
20  produce limitations on her abilities, is unsupported by Dr.
21  Campbell's own chart notes and other medical evidence in the
22  record.

23      The ALJ also determined that Dr. Campbell's recitation of
24  other side effects of plaintiff's long-term steroid use such as
25  loss of visual acuity, decreased ability to concentrate, mood
26  fluctuations, difficulty writing, and difficulty walking, were
27  based only on plaintiff's self-report and were not supported by the
28  record as no such symptoms appeared anywhere in the record.  Tr.

33 - OPINION & ORDER

20.  I agree with the ALJ and note again his freedom to reject medical opinions premised on subjective reports from discredited witnesses.

There is no mention of these other side effects in any part of the medical record, including no notations by Dr. Campbell that plaintiff had even reported these symptoms to him or any other medical provider.  The only part of the administrative record to note any of these other alleged side effects, if at all, is the transcript of plaintiff's hearing testimony.  Thus, while the dermatitis may well be a life-long condition requiring ongoing corticosteroid treatment, Dr. Campbell's opinion that the treatment's side effects included a loss of visual acuity, decreased ability to concentrate, mood fluctuations, and difficulty walking, is not supported by the medical evidence.  The record also does not support the suggestion that any of these conditions, if they exist, are in any way disabling.

The ALJ concluded his discussion of Dr. Campbell's opinion by noting that when Dr. Campbell's opinion is considered in conjunction with treating dermatologist Dr. Mendelson's refusal to state that plaintiff was unable to work because of the skin condition, Dr. Campbell's opinion was nothing more than advocacy and could not be accepted.  The record supports the ALJ's interpretation of the evidence.  A specialist's opinion carries more weight than that of a primary care provider.  20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) (opinion of specialist accorded more weight).  Given Dr. Mendelson's refusal to support plaintiff's quest for disability, and given the lack of medical evidence supporting much of Dr. Campbell's opinion, the ALJ's interpretation

34 - OPINION & ORDER

1  of Dr. Campbell's role is not unreasonable.

2      The ALJ's rejection of Dr. Campbell's opinion is based on the
3  whole record, is not based on the ALJ's own opinion, and is not in
4  error.

5  III.  What the Record Establishes

6      Even  without  considering  plaintiff's  testimony  or  Dr.
7  Campbell's opinion, the medical evidence in the record establishes
8  unequivocally that plaintiff suffers from a chronic skin condition
9  with periodic exacerbations.  However, the record shows that most
10  of plaintiff's flare-ups occurred during pregnancy or when she ran
11  out of  prednisone.   Thus, the  ALJ's assertion  that plaintiff
12  herself created situations in which exacerbations were likely to
13  occur, is based on substantial evidence in the record.

14      Additionally, although her flare-ups occasionally required
15  administration of  intravenous medications,  the acute  symptoms
16  usually resolved fairly quickly and thus, the record does not
17  support a finding that any limitations on plaintiff's basic work
18  activities would meet the duration requirement.  Accordingly, while
19  plaintiff has an  impairment, the record as  a whole supports  the
20  ALJ's conclusion that it is not severe at step two.

21      Finally, plaintiff argues that the combination of her
22  impairments, and not just the skin condition alone, supports a
23  finding of severity at step two.  As I understand the argument,
24  plaintiff contends that the skin condition, plus her other alleged
25  impairments noted at page three of this Opinion & Order, support a
26  severity determination.  I disagree.

27      First, without the skin condition being severe, her argument
28  is unavailing.  Second, even considering the skin condition as it

35 - OPINION & ORDER

is, and not as a severe impairment, the combination of her impairments still does not require a step two finding in her favor. Plaintiff does not argue in this case that the ALJ erred when he found that she had no medically determinable mental impairment. Tr. 18. And, there is nothing in the record to support any limitations on plaintiff's basic work activities caused by ovarian cysts or migraines. There is no support in the medical record for finding an "ADD" impairment. Thus, even when all other alleged conditions are considered in combination and with the skin condition, they do not support a finding of "severe" at step two.

IV.   Step Three Argument

Plaintiff argues that not only did the ALJ err in finding her impairment "not severe" at step two, but the evidence in the record supports a determination that her impairment meets or equals a listed impairment at step three.

The listed impairments cited by plaintiff are 8.00 and 8.05, found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 8.00 and 8.05. Listing 8.00 provides general information about how the Commissioner evaluates skin disorders. Listing 8.05 is more specific and addresses dermatitis. It provides that dermatitis (including atopic dermatitis, and exfoliative dermatitis), will be considered a listed impairment if it causes "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 8.05.

Because the ALJ did not err in his step two determination, I need not reach this step three argument. However, I note that the record does not demonstrate that plaintiff's baseline skin condition, absent flare-ups, produces "extensive skin lesions."

36 - OPINION & ORDER

The record also does not clearly demonstrate that the flare-ups produce extensive skin lesions which last for at least three months.  Thus, finding that plaintiff's impairment meets or equals a listed impairment is not supported in this record.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this __13th__ day of _March_____, 2009.


_/s/ Dennis James Hubel_____
Dennis James Hubel
United States Magistrate Judge

37 - OPINION & ORDER